## MILLER *v.* CHITTENDEN *et al.*

By an executory devise, a freehold may be made to commence *in futuro*, and no particular estate is necessary to support it; and where the future estate is to arise upon some specific contingency, the fee simple is left to descend to the heir at law, until such contingency happens.

The number of contingencies is not material, if they are to happen within the limits allowed by law; and the only question is, whether they are to happen within a reasonable time.

For the purpose of carrying into effect the intent of the testator, courts will sanction any mode pointed out by him, consistent with the rules of law. The intent will not be set aside, because it cannot take effect as fully as the testator intended, but it will be allowed to work as far as it can.

Where there is a present, immediate devise, there must exist a competent devisee, and a present capacity to take; but if there exists in the bequest, the least circumstance from which to collect the testator's intention of anything else than an immediate devise, to take effect *in presenti*, then, if confined within legal limits, it is good as an executory devise.

Where lands are granted to individuals, for the use of a church, which at the time of the grant is not incorporated as such, the persons to whom the grant is made, stand seized to the use, and when the church receives legal capacity to take and hold the real estate, the statute executes the possession to the use, and the estate vests.

Where J. M. being desirous, (as the deed recites,) to promote the cause of true religion in the town of Keokuk, and in consideration of one dollar, in hand paid, conveyed certain real estate to C. and four other persons, and their successors, as trustees, in trust, for the use, benefit and support of an orthodox Congregational Church at the town of Keokuk, *to be called and named* the Congregational Church of Keokuk, and said trustees were instructed and enjoined, to appropriate the land conveyed, and every part thereof, and all moneys arising from the sale, lease, or rent thereof, to the use, benefit, and support of the first orthodox Congregational Church *which shall be organized* at the said town, under the title aforesaid, and until such church shall be organized at the said town, the said trustees shall invest all such moneys, and allow them to accumulate for the benefit of said church, *until the period of such organization;* and where the trustees on the day of the execution of the deed, accepted the trust in writing, and agreed to execute the same; and where the said J. M. after the execution of said deed, in his

Miller v. Chittenden et al.

last will and testament, bequeathed certain real estate to his executors, in trust for his children, and to be conveyed to said children at the expiration of ten years from the date of said will, upon certain conditions, and if either of said children, in the judgment of said executors, failed to comply with such conditions, then the share of such child, was to be conveyed to the said trustees, for the use and support of a Congregational Church at Keokuk; and where the trustees, after the death of the testator, took possession of the real estate so conveyed, and subsequently a Congregational Church, bearing the name indicated in the deed, was organized; 1. *Held,* That the gift to the church, in contemplation of its organization, was valid, and the use good; 2. That the gift was a charity in its largest and most comprehensive sense, as understood either in morals or in law, and a trust in the narrow and more restricted sense, as applied to conveyances between individuals, which courts of equity have always recognized and enforced; 3. That the estate vested in the trustees, until the beneficiaries for whom the charity was intended, were in a condition to call for the application of the fund in the hands of the trustees; 4. That the use was not bad, because the trustees named in the deed, had no power to organize the church, or bring it into existence.

Courts are acting judicially, as long as they effectuate the intention of a donor.

## Appeal from the Lee District Court.

THIS cause was heard and decided at the June term, 1856, and will be found fully reported in 2 Iowa, 315, to which the reader is referred for a statement of the facts of the case. At that term, after the decision was announced, ~~Marshall, one of the defendants,~~ filed the following *J. C. Hall, Esq.*

### PETITION FOR A REHEARING:

S. T. MARSHALL, one of the defendants and party in interest in this case, now comes and petitions the court for a rehearing in this case, upon the following points, and prays for time to present a written argument.

FACT 1. That the title under and upon which he claims, was a purchase for a full and *bona fide* consideration from the heirs of James McKean, before there was any Congregational Church organized or contemplated in the city of Keokuk, and before the trustees under the deed to Chittenden and others, had in any manner reduced the premises to possession.

POINT 1. That, judicially and legally, the use remained in the grantor, McKean, and his heirs, and although the deed is evidence of an intention on the part of McKean, yet that intention was not executed in such a manner as can be upheld, upon any judicial principle, and if upheld at all, it must be by the prerogative power of the court.

FACT 2. That the intention of the grantor was to establish an Orthodox Congregational Church—strictly a pious use—limited to an association of persons holding a specific faith, and entirely distinct from a public dedication.

POINT 2. That there is a distinction between what the law terms a public dedication of real estate and a grant or devise for a limited pious use. The former is general, permanent —not subject to change, and the use and purpose of the grant becomes certain and beneficial as soon as made, as it imparts its benefits to surrounding and neighboring property. Dedications depend upon no persons, or class of persons, and can never fail, except by manifest abandonment. The latter are partially limited by a fact, transitory and incorporeal. The foundation is opinion or faith.

FACT 3. That when Marshall purchased from McKean's heirs, he knew of the existence of the deed to the trustees, but he had no knowledge of the presence or Congregational belief of those persons who resided in or about Keokuk, who held that doctrine, or of any intention of persons to form a church of that character. He had notice of one branch of facts necessary to pass the title from McKean; but as it is admitted that there must be beneficiaries, immediate or remote, he had no notice upon that subject, nor of facts that should put him upon inquiry.

POINT 3. That the deed from McKean to Chittenden and others, imparted only notice of its contents, and the other facts necessarily existing *in pais*, should at least exist in such a form that inquiry would disclose it, as the *bona fide* purchaser should be protected; every fact necessary to divest the grantor of his title, should be embraced in the notice.

That in carrying out the intention of the grantor, law will not complete what has been left undone by the grantor; the

act of the grantor must fix the character of the estate. If it is not so fixed, no judicial power can supply the defect.

FACT 4. That no act that has transpired since Marshall's purchase, could prejudice his title. That title was good or bad when he received it; if good, it could not be defeated by a subsequent organization of a church; if bad, it could not revert into a good title by a more extended laches of the church organization.

In urging upon the court, and insisting that this cause shall be opened for further investigation, consideration and argument, I know that there can be but one excuse—a thorough and deep conviction, after a full and careful reconsideration and re-examination of the principles involved in the decision, that the judgment of the court is erroneous, and that the error can be demonstrated and made apparent. With this conviction thoroughly fixed upon my mind, confirmed by a careful, and (as far as I am capable,) a candid examination of the very able opinion of the court, I now present the "judicial logic," and insist that this court shall stop and review the great principles passed upon in the examination of this case.

In urging this application to the court, I feel that I venture far, and hazard an imputation upon myself of "over zeal and stubborn persistence," after a full, careful, and labored investigation has fixed the wrong upon my cause. I know how repugnant it is to return and relabor a task already believed to be done. I feel the difficulty that lies in my path, in attempting to satisfy this court that a further investigation will compel it, as the dispenser of pure justice and enlightened law, to change this decision. It is not intended to renew the discussion upon all the points originally presented. Nearly all of them are satisfactorily disposed of in the opinion of the court.

The error in the conclusion of the court, consists in a misconception of the true distinction between judicial power—judicial action—and prerogative power—prerogative action.

The constitution of the state of Iowa limits and defines the powers of the courts of this state, to judicial power, and

their sphere to purely judicial action ; hence the court has very properly decided, that if they cannot uphold the grant from McKean to the trustees, without resorting to prerogative power, that it will not be upheld.

In discussing and examining this question, it must be borne in mind that the English authorities, where the doctrine of charities arose, and the American authorities, who have borrowed and followed the English, have combined and mingled the prerogative and judicial powers ; and that they declare that to favor these donations, they will assume and exercise powers not judicial, but prerogative.   This court should not be misled by these decisions, but should carefully discriminate, and find the separating line between the two powers, and confine its action to the exercise of judicial power alone.

Prerogative, according to the English law, and it is the same with American, is " an arbitrary power vested in the executive department of the government, to do good, and not evil."   Coke, Litt. 90 ; Rutherf. Inst. 279 ; 5 Bacon, A., 486, title Prerogative : 2 Bouvier's L. D. 370.   Under the constitution of our state, it is impossible for this power to exist, except by constitutional provision or legislative enactment.

Prerogative, when applied to the doctrine of charities, under the English constitution and government, operated upon the property, and arbitrarily retained it, for the purpose of carrying out the express or implied intention of the grantor or devisor.   The term *cy pres*, as applied to charities of this character, is merely words used to indicate one branch of prerogative power.   Where the devise could not be carried out in accordance with the words of the devisor, the estate was still held by the prerogative power of the government, and used for some other charity, approximating as near as practicable, the one indicated by the donor. When, to save the estate from the heir, the crown resorted to this approximate disposition of the property, it was called *cy pres*, as contradistinguished from the general and universal application and exercise of this power. .

Miller v. Chittenden et al.

The judicial power of this state is a co-ordinate branch or power of the government. The courts represent and exercise the powers of that branch of the government. They cannot make law. They cannot fix the relations between persons and property. They must follow and enforce the law, whether good or bad. They are not arbitrators, but the interpreters of the law. They cannot interpose their power to destroy or to uphold, only when the law has fixed the *status*, and authorized judicial action.

To the courts of this state, the constitution and the law have confided the duty of ascertaining and declaring what the law is, and enforcing the mandates and judgments when rendered. They can investigate and decide upon the rights of persons and the right of things; private rights and public wrongs, in accordance with known and established law: and here their duty ceases, and here their powers are at an end. Indeed, to use the word power, in defining the real duty of courts, is deceptive. It is not the exercise of power; it is the naked science of ascertaining rules that exist, and applying those rules to the facts, which the case under consideration demands from the laws of the land. To ascertain and declare what the law is, is not the exercise of a power.

On the 25th day of December, 1846, John McKean executed a deed for the land in controversy, to A. B. Chittenden and others, in trust, and for the use and benefit and support of an Orthodox Congregational Church at the town of Keokuk, to be called and named the Congregational Church of Keokuk. At the time the deed was executed, there was no church of that denomination in Keokuk, in an organized or unorganized form; nor was there any associated body of persons to which the grantor referred, or intended to refer. The church, which was to be the beneficiary, was not in existence, nor was there any power to bring it into existence. There was no existing law, rule, or power, from which such an institution would certainly emanate.

McKean died in March, 1847. In August, 1849, defendant, Marshall, purchased the land for a valuable considera-

tion, from several of the heirs of McKean, and immediately thereafter filed his petition in Chancery against the trustees to vacate the trust and have the title quieted and decreed to him, which petition was heard, and the Supreme Court of the State adjudicated in his favor, but remanded the case back to the District Court, where the same is now pending.

In 1852, the present petition was filed. In February, 1854, a Congregational Church was organized in Keokuk. Previous to that organization, a number of persons had resided in Keokuk who professed to hold the Congregational faith, but had attached themselves to the Presbyterian Church, under some arrangement with that organization.

It is about seven years from the date of the deed from McKean to the trustees, to the organization of the church. It is nearly five years after Marshall purchased from the heirs of McKean, and filed his bill to set aside the conveyance and have this title quieted, before any church was organized. At the time the church was organized, the suit of Marshall and the suit of Miller were both pending. The title upon which those suits were based, had been made nearly six years. Now the question is, whether Chittenden and the other trustees have acquired the title to the land in controversy, by purchase from McKean, under the deed of December 25th, 1846, or whether Marshall acquired title under his purchase from McKean's heirs, in August, 1849. These titles are here brought together, and must be tested by rules of law. There is no failure of trustees. Their deed is in form and without exception. There is no fraud, mistake or accident, or trust, as between these titles; one or the other party has the title, without the aid of a court of equity. Marshall purchased whatever right, title and interest the heirs had at the time he obtained the conveyance. Whatever Marshall acquired by the purchase, he still holds.

The conveyance from McKean to Chittenden and others, passed a naked legal title, and in terms excluded the possibility of their having an interest or use. The use was separated from the legal title. The *cestui que use* indicated in

the deed, was not in existence; so that it was impossible for it to vest. It must return to the vendor. The absence or non-existence of a specific object of the grant being apparent in the deed itself, fixes this position.

Now it is distinctly asserted in the case of *Trustees of P. B. Association* v. *Hart's Ex.*, 4 Wheaton, 1, that where there are no particular persons designated, who are the individual objects of the testator's bounty, there is no *cestui que trust* to claim its execution; consequently, the estate is not disposed of. And this particular principle asserted in that decision, is expressly preserved by Story in *Vidal* v. *Gerard's Executors*, 2 How. 127. There is no conflict in those decisions on this point. This same doctrine is fully recognized in *Wheeler* v. *Smith*, 9 How. 55, by that court, some years after the decisions in the other cases.

*The Town of Powlet* v. *Clark*, 6 Cranch, 336, relied upon by the court, I think when fully understood and applied, fully establishes the doctrine we contend for. In that case, it appears that in 1761 a royal grant was made to a number of persons, of land, in the town of Powlet. In the grant was " one share of five hundred acres for a glebe for the Church of England, as by law established." There was no established religion; but every town was by law required to support and maintain some kind of religious worship. There was no church established in that town of that denomination, prior to 1802, and that not in accordance with the canons of that church. After the Revolution, and after Vermont became separated from New Hampshire, and succeeded to all the rights of the crown, to the unappropriated as well as appropriated glebes, in 1781, a law was passed putting these lands into the charge of the selectmen of the town. In 1794, the state granted the entire property in the glebes to the town, for the sole use of religious worship, and authorized the selectmen to lease and recover these lands. In 1795, the act of 1794 was repealed, and in 1805, all the glebes were given to the towns for the use of schools, and the selectmen were authorized to lease them, &c.

In 1802, there was, in the town of Powlet, a society of

Episcopalians, duly organized under that denomination, known as the Church of England. They employed a Mr. Chittenden, a regularly ordained minister of that church, to preach for them, and gave him the glebe in question, who leased it to defendant, Clark, and others, who went into possession, and Chittenden received the rents. Chittenden died in 1809, and a Mr. Bronson, a regularly ordained minister, officiated there, and received the rents and profits of the land until September, 1811, when the Rev. Stephen Jewett became the regular pastor of that church.

It will be seen here, that the contest was between the schools and the church—the church claiming under the royal grant of 1761; the schools under the statutes of 1784 and 1805.

The following propositions are clearly decided by the court:

1st. That the royal grant was a dedication for the use of the church, which could have no existence without such endowment, and consequently the title remained in abeyance for the consecration of the church.

2d. That inasmuch as the citizens of the town had by law, to maintain religious worship, they were invested with a right to the use.

3d. That after the grant was made, the crown could not retake the land to itself, without the consent of the town, and the church, if there was one.

4th. That after the Revolution, the state of Vermont succeeded to all the rights of the crown, in relation to these lands.

5th. That if before the passage of the act of 1794, there had been a regularly organized church, according to the rules and laws of the Church of England, the act of 1784 could not have divested them of the use, without their consent and the consent of the town.

6th. That the church organized in 1802, was too late. The town being the only *cestui que use* in existence in 1784, had the right to assent, and with that assent, the state could change the entire character of the grant, and give it to schools.

Now, I think the principles presented in this case, clearly show that if there had been no town or municipality in the territory of Powlet, the state of Vermont could have exercised perfect dominion over the lands.

The church in that case lost the lands, because they were not organized in 1794, and the right of the state to change the grant is fully recognized. The English crown was in the place of McKean; the state of Vermont, McKean's heirs; the town of Powlet, Marshall; the Church of England, the Congregational Church. Before the Church of England (the Congregational Church) was organized, the state of Vermont, heir to the English crown, resumed power over the grant, and conveyed it to Powlet (Marshall). The title was held good to Powlet; (bad to Marshall).

*Beatty & Richey* v. *Kurts et al.*, 2 Peters, 566, and particularly referred to by this court, it is believed, upon careful examination, will demonstrate the proposition and principle contended for by me. In the opinion of Justice STORY, it will be found (page 583, 584) that he puts the decision upon the Bill of Rights of Maryland, which gave validity " to any sale, gift, lease or devise of any quantity of land not exceeding two acres, for a church, meeting, or other house of worship, and for a burying-ground, which shall be improved, enjoyed or used for such purpose." And he says : " We think there, it (the donation) might at all times have been enforced as a charitable and pious use, through the intervention of the government as *parens patria*, by its attorney-general or other law officer." Now I must insist, that here in Iowa, where we have no such bill of rights, and the doctrine of prerogative power of *parens patria*, is denied, this decision, which is based upon that power, has no application whatever. In no sense can the doctrine of that case apply. There, the proprietor of Georgetown had dedicated a lot; it had been entered upon and occupied by persons claiming the right, for fifty years, without molestation.

In the case at bar, the donation is reclaimed, and sold to Marshall, for a valuable consideration, before a solitary claim was interposed, or a single right vested, or a claimant was

in existence. There is not a vestige of similitude between the two cases. There was an intention and appropriation in that case; in the case at bar, there was an intention, but that intention was withdrawn, and the land sold for a valuable consideration, before the intended beneficiary had an existence.

The case of *Winslow* v. *Cummings et al.*, 3 Cushing, 358, does·not embrace the principle in this case.

Winslow devised a sum of money to the Marine Bible Society. There was no such society; but there was an organization unincorporated, which the court found by evidence was the one the devisor really intended. This society was not the beneficiary. They were themselves but the benevolent instruments of charity to the sailors, marines, &c., as a class of persons who have been the objects of enlightened charity. The court properly decreed that the appointment of a trustee would obviate all objections, and that the fund should be used in accordance with the will of the donor, in furnishing the Bible to the sailors and marines. The decision was put upon the express ground, that the "object of the legacy, and the particular use to which the testator appropriated it, could be ascertained; that it had a well defined object of charity, and mode of distributing its funds, which could be carried out, and effectuate the intention of the testator." The question was not even suggested in the case, that there were no persons who could receive the benefit of the money, but it turned wholly upon the existence of a benevolent association, who should become ,mere trustees in distributing it to the objects to favor whom the society was formed.

The case of *Inglis* v. *Snug Harbor*, 3 Peters, 99, is referred to as " a case very much in point." This case ᵥshows that Robert Richard Randal devised a large estate in the city of New York, to the chancellor of New York, the mayor and recorder of New York, &c., in trust, to erect and build, upon some eligible situation of the land upon which he resided, an Asylum or Marine Hospital to be called the Sailors' Snug Harbor, for the purpose of supporting aged, decrepid and worn out sailors, &c. The will

continues by requiring an act of incorporation, in case it is found necessary, and that if the devise should be like to fail, on account of or for the want of legal form, that his relations or heirs who should take the property, should hold the same for the use therein indicated.

The only question in the case upon this point, as appears in the opinion of Justices THOMPSON, JOHNSON and STORY, was the capacity of the trustees named to take the estate. The question as to the beneficiaries did not arise, nor was it made in the argument.   Justice STORY reiterates the doctrine in *Philadelphia Baptist Association* v. *Hart's Executors*, 149.   With due respect, I must express the opinion that this case throws no light upon the question, unfavorable to the doctrines that I contend for.

The case of *City of Cincinnati* v. *White's Lessee*, 6 Peters, 429, is also referred to as in point.   A careful examination of this case will show a very different question from the one at bar.   The opinion follows the doctrine laid down in *Beatty* v. *Kurtz*, 2 Peters, 566, and *Powlet* v. *Clark*, 9 Cranch, 292, that in cases of public dedications, it does not require a grantee; that the owner of the land when dedicated, would himself be seized for the use designated; but the idea that a party as a trustee could stand seized to a use, before the object is in existence which is to be the recipient of the dedication, is not entertained or discussed in that decision, but the controversy is between the beneficiaries and the donor.

If A. should lay out a town or city upon unimproved land, and dedicate by writing on the plat or by parol, streets, but before selling any of the lots or property, should conclude to resume dominion, and should do so, could the public enforce the dedication and avoid the resuming act of the original owner?   The case of *Powlet* v. *Clark*, clearly decides this point.   The donor or his heir can resume his donation any time before the *cestui que use* is in a condition to receive, but when the use becomes vested, his power to resume the interest ceases, although no legal title has been vested in trustees.   The law makes the donor a trustee for the use indicated.   This is the extent of the doctrine, and it

is only by confounding the trust with the use and making them synonymous, that any other conclusion can be arrived at.   In the case at bar, the trustees are not denied or their condition controverted, but the Congregational Church, which must be the recipient and beneficiary, being in the same condition as the Episcopal Church in Vermont, in 1794 and 1805, where the state resumed dominion over the glebe of Powlet, and disposed of it, we say, has lost the use, by the resumption of this property by McKean's heirs, and disposing of it to Marshall.   The court say (438): "And after being thus set apart for public use and enjoyed as such, and the private and individual rights acquired with it, the law considers it in the nature of an estoppel *in pais*, which precludes the original owner from revoking such dedication." "It is a violation of good faith to the public, and to those who have acquired property with a view to the enjoyment of the use thus publicly granted."   Again (440): "There is no particular form or ceremony necessary in the dedication of land for public use.   All that is required, is the assent of the owner of the land, and the fact of its being used for the purposes intended by the appropriation."   Now suppose that there had been no enjoyment of the dedication by the public—no private or individual rights acquired with reference to the dedication; that it had never been used for the public purposes intended by the appropriation, would the owner be estopped and precluded from revoking the dedication?   Clearly not; and this is the turning point in the case.   There must be a dedication and beneficiaries.   This is clear and incontrovertible.

Having now reviewed the decisions on this subject, made by the Supreme Court of the United States—made when that bench was filled by the ablest jurists of the age, it will be useless to proceed further.   Yet the opinion may be ventured that no respectable court has, since those doctrines have been fully passed upon by the Supreme Court of the United States, doubted their validity, or controverted the law, as laid down by that court.   The decisions of that court have been made in controversies arising in several

different states, and the doctrines have assumed a character to meet the peculiar local doctrines of the different states. Hence, we see decisions where the doctrines of prerogative and *cy pres* are admitted, as in New York and Maryland, and where they are not, as in Virginia, &c. From these decisions it may be affirmed with implicit confidence, that:

1st. A donation, grant or devise, for a public or pious use, will never fail for want of a grantee or trustee.

2d. That where the object to be benefited by the donation, grant or devise, is not in existence, or is of so indefinite a character that the court cannot superintend the distribution, the grant fails, or can be resumed by the grantor.

The principle is an obvious one, and is based upon the rule at common law that applies to all donations. A gift without possession or occupancy, is void, and cannot be enforced. A trust with possession, when there is no one to receive the use, can be reserved by the donor at pleasure. The trustee, having no interest, cannot complain. There is no other person interested or identified, who can complain; hence, there can be no remedy.

I now come to the opinion of the court in this case, which I insist is erroneous. The error consists in not carefully distinguishing between the true rule that exists between the donor and the *cestui que use*, but by confounding the doctrine that pertains to the donor and trustee with that of the *cestui que use*. The law that controls all donations or gifts, prevails in regard to charities and pious uses.

It is well settled that a gift without delivery, is void. *Noble* v. *Smith*, 2 John. 52; *Granger* v. *Arden*, 10 John. 293; *Pearson* v. *Pearson*, 7 John. 26; *Pitts* v. *Mangune*, 2 Bailey, 588.

Without contending that there must be actual possession, either in the trustee or beneficiary, in case of charitable donations, yet it is certain that there can be no charity or use created, without an object upon which to bestow the charity, or a person to receive the use. At any time before the use is vested, it may be revoked. The conveyance by McKean's heirs to Marshall, and his suit commenced in 1849, was a complete revocation; and no subsequent organ-

ized church could become seized of a use of this land.   The dedication, grant or gift, was incomplete until the beneficiary came into existence and was capable of receiving, and until that happened, it could be revoked by McKean or his heirs. Now in law, can this title or use remain in abeyance, in spite of McKean and his heirs?   Was the land so disposed of and sold, that they could not revoke and resume dominion over it?   It must be borne in mind that the sale to Marshall for a valuable consideration, and Marshall's subsequent possession, is as solemn an act of revocation and assertion of dominion as could be done by the party.

The opinion of the court decides this question to a certain extent.   The court say:  "We are asked if this grant is sustained, how this court could have ordered its execution, if the church was not organized, or if required to do so before the organization?   We answer that in such a case the grant would not have been upheld.   In other words, we could not have given it to a beneficiary that at the time had no capacity to take."

This court, then, would not have upheld this title as against Marshall, at the time of his purchase.   It was then, not a title that could be sustained in law; nor would this court have upheld this title, up to the very day of the organization of the church, which was five years after Marshall purchased, and nearly that time after he had appealed to the court to have this revocation and his title quieted.   If Marshall had been so fortunate as to have brought his suit to a termination after four years' litigation, this court would have adjudged his title good.   Now, could anything but the omnipotent power of prerogative, snatch the estate from the certain grasp of Marshall, after these four years of conceded right and indefeasible title?   Surely, nothing but the ultra doctrine of *cy pres* can sustain such a singular condition of real estate.   There is no principle of law that leads to this conclusion.   Surely, upon every rule of law and equity, when Marshall purchased and sued for his rights, if he was entitled to a judgment, no act of the adverse litigant could debar him of that right. He had a right to the land when he purchased; he has it now.

The most that can be said is, that McKean, by deed, expressed his intention to donate this land to a charitable use, and died avowing that intention; but his death transmitted that intention to his heirs; he carried no power or control with him to the grave, but left all to his heirs. They revoked that intention, as he could have done. They had as full power as he had. They sold the land for a valuable consideration, at a time when there was no interposing claim, and before the intention had become executed or any right vested.

The question arises whether the law will uphold this intention, or whether it requires prerogative. It is not a case of a lapse, for an estate can only lapse where it has begun and is abandoned—it lapses for non-use. In this case, it never began; it is in the precise situation that the Episcopal Church was in the town of Powlet. The estate had been otherwise disposed of, before the church was organized to take the glebe.

Upon what legal principle can this estate be said to rest in abeyance, after McKean's heirs have conveyed to Marshall for a valuable consideration—for what? Not for want of a trustee to hold, but for the want of a subject upon which the bounty can be bestowed. This doctrine would simply say: that the conveyance was made as an experiment. The estate was nobody's—belonged to no one—could be used by no one for an indefinite, but reasonable time for a church to organize; but if no church was organized within that time, then the estate was McKean's.

Now, the only difference between this doctrine and the doctrine of prerogative, as acted upon in England, is, that the prerogative power held it for that or some other approximate purpose. The doctrine of this court uses the prerogative power, to hold it for a time in spite of the party, and then if the object of the charity does not appear, the court gives the property back to the owner. In other words, the court uphold the estate from the owner to find the owner, and then give it to the owner, unless in the meantime an owner is created.

In Adams' Doctrine of Equity, 68, it is said, "that where an apparent charitable intention has failed, whether by an incomplete disposition at the outset, or by subsequent inadequacy of the original grant, effect may be given to it by a *cy pres*, as an approximate application, to the exclusion of a resulting trust for the donor." Now I insist that the donation by McKean was incomplete, and that a court of chancery has no power to complete it; that McKean in his lifetime, and his heirs after his death, held this as a resulting trust, and in abeyance (if you please), just so long as the original intention continued, and no longer; that the entire unincumbered estate necessarily remained in McKean and his heirs, and was subject to their will, and that a *bona fide* purchaser without any notice, except what the deed gave, took the fee simple title in accordance with the deed, and not an inchoate contingent title; that when this court interposes a power to uphold this estate, independent of any parties, such power is not judicial; that it is the exercise of a prerogative power, and it is so laid down in books.

There are several incidents that transpired after the conveyance by McKean to Chittenden, that have assumed an importance in this decision, which I forbear to discuss in this argument, believing that a careful recurrence to the authorities, and greater deliberation upon the true and established principles governing property in these cases, will at least satisfy the court, that justice and the cause of truth require that this case shall be opened for a re-argument.

The petition for a rehearing was taken under advisement, until the December term, 1856, when the following opinion overruling the petition for a rehearing, was filed.

STOCKTON, J.[1]—The objection taken by Marshall, to the claim set up by the trustees to the land conveyed to them by McKean, is, "that at the time the deed was ex-

---

[1] WOODWARD, J., dissenting.

ecuted, there was no Congregational Church at Keokuk, in an organized or unorganized form ; nor was there any associated body of persons to which the grantor referred or intended to refer." The conveyance from McKean to Chittenden, passed a naked title ; and, in terms, excluded the possibility of their having an interest or use. The use was separated from the legal title. The *cestui que trust* indicated in the deed, was not in existence, so that it was impossible for it to vest. It must return to the vendor We state the position assumed by Marshall, in the words of his counsel. It may be stated by them in different form and language, but it always comes to the same thing—there was no church in existence to take the beneficial interest in the property conveyed ; the trustees had no power to bring the church into existence ; and the conveyance to Marshall, by the heirs of McKean, was a revocation of the grant.

In the first place, we have to say, that it was not contemplated by McKean, that the church was organized at the date of the deed, and the gift was not one *in presenti*, to take effect immediately upon its execution. It is for the use, benefit and support of the First Orthodox Congregational Church which shall be organized at Keokuk, that he gives the land. He directs the trustees what they shall do with the land, until such church is organized. He knew there was no such church then in existence, and it was to aid in its organization and support, that the donation was made. If, then, McKean's heirs were entitled to the land, the deed was void *ab initio*. It conveyed no interest to the trustees, and it is immaterial whether they took possession of the land or not. It is immaterial how many Congregationalists there were in Keokuk at the time of its execution. It is immaterial whether the church has since been organized or not. There was no beneficiary in existence at the time, to take the trust estate, and therefore no interest passed. Such is the position and argument for Marshall. It will not, perhaps, be controverted, that by an executory devise, a freehold may be made to commence *in futuro*, and no particular estate is necessary to support it. The future estate is to arise upon

some specific contingency, and the fee simple is left to descend to the heir at law, until such contingency happens. 2 Blackf. 175. The number of contingencies is not material, if they are to happen within the limits allowed by law. The only question is, whether they are to happen within a reasonable time. 3 Peters, 115. In *Inglis* v. *Trustees Sailors' Snug Harbor*, the devise was to an association unincorporated, on its becoming incorporated. It was sustained by the court, on the ground that it did not purport to be a present devise to a corporation not in being, but a devise to take effect *in futuro*, upon the corporation being created; and the contingency was held not to be too remote. For the purpose of carrying into effect the intention of the testator, courts will sanction any mode pointed out by him, consistent with the rules of law. They will not set aside the intent, because it cannot take effect as fully as the testator intended, but let it work as far as it can. 4 Vesey, 325; 12 Mass. 543; 3 Binney, 162. It has been held, that if the corporation for whose use the property is intended, is not *in esse*, and cannot come into existence, but by some future act of the crown, the gift is valid, and the court will execute it. *White* v. *White*, 1 Bro. Ch. 12. In such instances, the distinction must be observed between a devise to take effect *in presenti*, and the same devise to take effect *in futuro*. In the *Baptist Association* v. *Hart's Exrs.*, 4 Wheaton, 1, the court considered the bequest gone for uncertainty as to the devisees, and because the society, not being incorporated, was incapable of taking the trust. But if the testator in that case, had bequeathed the property to the Baptist Association, on its becoming, thereafter, and in a reasonable time, incorporated, there could not have been a doubt but that the subsequent incorporation would, even in the opinion of the court deciding that case, have conferred on the association the capacity of taking and managing the fund. 3 Peters, 114. The court would have felt itself bound to carry out the intention of the testator. It is the general rule, says JOHNSON, J., in *Inglis* v. *Sailors' Snug Harbor*, 3 Peters, 144, that where there is a present immediate devise,

there must exist a competent devisee, and a present capacity to take.   But it is equally true, that if there exists the least circumstance from which to collect the testator's contemplation or intention of anything else than an immediate devise, to take effect *in presenti*, then, if confined within legal limits, it is good as an executory devise.   In *McIntyre Poor School* v. *Zanesville Canal and Manufacturing Company*, 9 Ohio, 203, it was held, that a bequest to charitable uses, may take effect as an executory devise to a corporation subsequently acquiring a capacity to take; and in the following cases it has been held, that a devise to a future incorporation is good: *Porter's Case*, 1 Coke Rep. 22; *Coggeshall* v. *Pelton*, 7 Johnson Ch. 292; *Mylne* v. *Mylne* 17 Louisiana Ch. 46.

The questions discussed in the case before us, arise under the deed by McKean to the trustees, and not under a devise by will.   For Marshall, it is claimed, that this conveyance passed no estate, for the purposes of charity, because there was, at the time, no Congregational Church organized and in existence, to take the beneficial interest.   In respect to conveyances between individuals, it is well settled, that every deed must have sufficient certainty as to the grantee who is to take under it.   If it cannot be known who is to take, the grant is void, for the uncertainty.   So, where the *cestui que trust* is incapable of taking the gift, the intervention of trustees does not remove the difficulty.   And in general, it may be stated, that there is the same necessity for a *cestui que trust*, capable of taking the beneficial interest, that there is for a properly defined grantee in a deed. In this case, there must either be a *cestui que trust* capable of taking the use, or some overruling reason, why it should not be governed by the well settled rules of law; otherwise, the estate descended to the heirs of McKean at his death. Was the use bad to which McKean conveyed the land? The question is not whether the gift was void, because the church was not in existence.   McKean knew the church was not organized.   It was not a mistake on his part, in conveying to the use of a church, which was afterwards discovered to have no existence as a church organization.   It

was not a conveyance to take effect *in presenti*. The grant is to the trustees, to appropriate the land, and all moneys arising from the sale, lease or rent thereof, to the use, benefit and support of the First Congregational Church which shall be organized at Keokuk. And until such church shall be organized, the trustees are to invest all moneys arising from the sale, lease or rent of said land, and allow them to accumulate, for the benefit of the church, until it is organized. The question then is, was the gift by McKean to the church, in contemplation of its organization, valid? Was the use good?

Such conveyances have been held good in Maine, in the case of *Shapleigh* v. *Pillsbury*, 1 Greenleaf, 271; in Massachusetts, in the case of *Rice* v. *Osgood*, 9 Mass. 38; in New York, in the case of *Reformed Dutch Church* v. *Veeder*, 4 Wendell, 494; and in the Supreme Court of the United States, in the case of the *Town of Powlet* v. *Clark*, 9 Cranch, 292, (3 Curtis, 358.) In these cases, it has been held, that if the lands are granted for pious uses, to a person or corporation not *in esse*, the right to the custody and possession of the lands remains in the grantor, until the person or corporation intended, shall come into existence, but the donor cannot resume the grant. If, on the other hand, the grant is made to individuals for the use of the church, which at the time of the grant is not incorporated as such, the persons to whom the grant is made, stand seized to the use, and when the church receives legal capacity to take and hold the real estate, the statute executes the possession to the use, and the estate vests. 4 Wend. 497. In *Powlet* v. *Clark*, STORY, J., says: "A donation by the crown to the use of a non-existing parish church, may well take effect by the common law, as a dedication to pious uses. After such a donation, it would not be competent for the crown to resume it at its own will, or alien the property, without the same consent which is necessary for the alienation of other church property." "Before such church were duly erected and consecrated, the fee of the glebe would remain in abeyance, or at least, be beyond the power of the crown to alien, without

the ordinary's consent." 9 Curtis, 332. As to the object to which McKean was desirous of dedicating a portion of his estate, there can be no mistake. He prefaces his donation, by declaring himself " desirous to promote the cause of true religion in the said town " of Keokuk. He sought to provide for the organization and support of an Orthodox Congregational Church at that place, and for the promotion of " the cause of true religion" there, by means of the preaching of the gospel to its people by ministers of that order. But, can it for a moment be supposed, that the beneficial results sought to be accomplished, were intended by him to be limited to the communicants, or members of the organized church? That would be a very narrow view of the benefits to be conferred by the donor's bounty, which would restrict it to the Congregational Church, whose organization was contemplated in the deed to the trustees. The beneficiaries were to be confined to no such narrow limits. The fund was, indeed, to be retained until the particular church was organized. It was to be administered, if you please, and " the cause of true religion promoted," by means of denominational teachers, holding the peculiar views and opinions in religious doctrine and church government understood to be entertained by Orthodox Congregationalists. . But we think we can clearly see that it was within the contemplation of the donor, that every inhabitant of Keokuk, of whatever order, faith, or persuasion, was to receive the benefits of his bounty, and share in its effects. They were all the beneficiaries, and the gift was a charity in its largest and most comprehensive sense, as understood either in morals or in law, and a trust in the narrow and more restricted sense, as applied to conveyances between individuals, which courts of equity have always recognized and enforced. " It is now too late," says STORY, J., 3 Peters, 482, " to contend that a disposition to favor charity, can be construed according to the rules which are applicable to individuals." McKean desired this church to be organized and supported in Keokuk, not alone that it might be the means of furnishing religious privileges and instruction to those who, from time

to time, might become its members, but as the best means presented to him, of conferring a benefit upon the whole community in which it should be established.

This disposition to favor charity, was manifested by setting apart a portion of his estate for the support of the gospel, through the means and instrumentality of .the Congregational Church. There was no pecuniary consideration for the conveyance to the trustees. That was not necessary. Other considerations, quite as effectual and sufficient, moved him. The support of the gospel in a Christian country, is a sufficient consideration. 4 Wendell, 496. The objection that there was no beneficiary to take the use, is not sustained, either in law or fact. By direction of the grantor, and according to his intention, the estate vested in the trustees, until the beneficiaries for whom the charity was intended, were in a condition to call for the application of the fund in the hands of the trustees. Such appropriations have been held valid, upon principles other than those which ordinarily apply between grantor and grantee, and are supported as dedications, to public and pious uses. 2 Cranch, 583.

Is the use bad, because the trustees named in the deed of McKean, had no power to organize the church, or bring it into existence? Although the trustees had no power to organize the church, in the sense in which they might, under a power conferred by deed or will, establish " a school for indigent scholars," (1 Hawkins, 97,) or a college for the education of orphan children, (2 Howard, 127,) or an asylum for disabled seamen, (3 Peters, 99;) yet there was a duty devolved upon the trustees by the grantor, which shows that it was contemplated by him, that the fee should remain in them, subject to the capacity to be acquired by the persons of the Congregational faith in Keokuk as an organization, to require the appropriation and application of the fund. They were to sell, lease and rent the land, and invest the moneys arising therefrom, and allow them to accumulate, until the church was organized. Although the church may not have been at this time in existence, there was still something to be done by the trustees, before the

use was to vest.  In what respect does the principle on which such a grant may be sustained, differ from that established in *Shapleigh* v. *Pillsbury*, *The Reformed Dutch Church* v. *Veeder*, and *Powlet* v. *Clark?*  Wherein does it differ from from that which Judge STORY says was established by *Porter's Case*, 1 Coke Rep. 22, "that if a feoffment is made to a general legal use, not superstitious, though indefinite, though no person is *in esse* who could be the *cestui que use*, yet the feoffment is good?"  3 Peters, 487.  Courts are acting judicially, as long as they effectuate the intention of the donor.  4 Dana, 366.

In sustaining the grant to the trustees in the present case, we will not be supposed desirous of exercising any other than judicial powers in carrying out the intention of Mc-Kean, as manifested both in his deed and his will.  In one class of cases, it has been held, that the doctrine of *cy pres*, as administered in England, is a judicial doctrine, in which cases a court of equity may substitute or sanction any other mode that may be lawful or suitable, and which will effectuate the declared intention of the donor.  *Moore's Heirs* v. *Moore's Devisees*, 4 Dana, 355; *Attorney-General* v. *Wallace's Devisees*, 7 B. Monroe, 611.  There is no necessity, however, in this case, for a resort to any such doctrine.  No inadequate, illegal or inappropriate mode has been prescribed by McKean for making his charity available.  The mode prescribed by him has not failed.  The trustees are ready and willing to carry it out on his own scheme, and the objects to be effected are identified and ascertainable.  There is, therefore, no occasion for the exercise of a power, in England deemed a part of the prerogative of the sovereign, as *parens patriæ*.

It is claimed for Marshall, that he purchased the interest of McKean's heirs, for a valuable consideration; that the right to resume the grant was in McKean at his death, and descended to his heirs; and that by their conveyance, Marshall became possessed of a complete legal title to the land, which no subsequent organization of the church could divest.  We admit that if Marshall's title was ever good, it is

good still.  But it will readily be perceived that his title may be adjudged good and sufficient on one statement of facts made to the court, when it would not be so deemed when the whole or additional facts were made to appear. It might well be deemed sufficient, on demurrer to the bill in Chancery filed by him, to set aside the deed to the trustees, when it would be considered wholly insufficient when tested by all the facts shown in the record now before us. What right had the heirs of McKean to this land? and what right had they to convey it to Marshall?  McKean himself had manifested no disposition to resume the grant, up to the time of his death.  By his will, made a short time before his decease, so far from intimating any such desire or intention, he confirms the grant, rather, and so far, such confirmation may be inferred from its express recognition. If the donation had been, and the land conveyed, for the benefit of a Congregational Church, which the donor erroneously supposed was in existence at Keokuk; if, at the time of McKean's death, and for a reasonable time thereafter, there had been no persons of the Congregational persuasion in Keokuk; if no attempt had been made to organize and establish a Congregational Church there; if the trustees had not accepted the trust, and taken possession of the land; and if there had been no recognition and confirmation of the grant by the testament and last will of the donor, the case might have presented such a state of facts, and there might have been such a failure of the *cestui que trust*, as that the heirs of McKean would have been entitled to resume the grant.  But there is an entire lack of every essential element towards making out the state of case on the part of Marshall, the claimant under the heirs.  In the first place, the gift to the church was not to take effect *in presenti*, but only at such future and reasonable time as the church should be organized—the fee, in the meantime, remaining in the trustees, with power to sell, lease and rent the land, and accumulate the proceeds until the period of such organization.  In the second place, it is shown, that at the time of McKean's death, and since, there were persons of the Con-

gregational faith and persuasion residing at Keokuk, who being few in numbers, did not deem it advisable to establish a church in that place, until the funds arising from the charity of McKean, should be sufficient to furnish the means of supporting it, without too heavy a pecuniary burden upon themselves.  Many of these persons were united temporarily with the Presbyterian Church of Keokuk, which, being identical in doctrine, so modified its discipline and church government as to render it substantially a Congregational Church.  In the third place, it is shown, that at no time had the intention been abandoned of organizing such a church, so soon as the number and means of its friends became sufficient to sustain it; and that in the year 1854, an Orthodox Congregational Church was organized in Keokuk, for which the trustees, under the deed of McKean, are now claiming the land in controversy, as dedicated by him, to its use.  In the fourth place, it is shown, that immediately after the death of McKean, the trustees took possession of the land, leased a portion of the same, and that their possession has continued ever since; that this litigation respecting the title, commenced in 1849, shortly after the purchase by Marshall from the heirs; that the church would long since have been organized, and the benevolent intention of McKean carried into complete effect, but for the obstacles thrown in the way of such a consummation, by the very litigation which the claimants under the heirs have caused; and but for the cloud they have thereby cast upon the title of the land, whereby, for all practical and useful purposes, it has been rendered unavailable; and finally, it is shown, that by the will of John McKean, executed in February, 1847, he recognized the conveyance made by him to the trustees, and the purposes for which it was made, and provided that other lands, by him devised to certain of his heirs, upon condition, should, on the failure of such condition, be vested in the same trustees appointed by his deed, for the same use and purposes therein mentioned.

We have to say, in conclusion, as an apology, if any

should be deemed necessary, for this second opinion in this cause, after the full and able opinion of the chief justice, delivered at the June term, that after that opinion was delivered, a petition for a rehearing was filed by Marshall, the claimant under the heirs of McKean, and the cause was, in effect, re-argued by the counsel on both sides.   The court have reconsidered the cause, both with reference to the new authorities cited, and others which have come under their notice.   We have not been disposed to deny to the party, against whom, we have felt obliged to give our decision, the fullest opportunity of being heard, consistent with our other duties.   This was due alike to the magnitude of the questions adjudicated, and to the ability and earnestness with which views, the opposite of our own, have been urged by the counsel.   It is necessary, however, that the discussion should cease at some time, and the litigation be brought to an end.   Having seen no good reason to change the views heretofore announced, the petition for a rehearing is overruled.

WOODWARD, J., dissenting.—On a re-examination, and a more thorough investigation of this cause, under the petition for a rehearing, I am obliged to differ from the majority of the court, so far as to think that a rehearing ought to be granted.   I am not satisfied with the decision as it is, and the doubt might involve some question as to that in *Johnson* v. *The Methodist Episcopal Church*, also, *Ante*, 180.   The subject is too large to permit an examination of it at present, but I wish to hold myself at liberty upon it, if it again arises.