## Case No. 5,503.

GOESELE et al. v. BIMELER et al.

[5 McLean, 223;[1] 8 West. Law J. 385.]

Circuit Court, D. Ohio. April Term, 1851.[2]

UNINCORPORATED · ASSOCIATION — CAPACITY TO HOLD LAND—CONVEYANCE TO TRUSTEES—LAND BOUGHT BY JOINT LABOR OF A COMMUNITY—DECLARATION OF TRUST — PERPETUITY—COURT OF CHANCERY — FORFEITURE - PENALTY—STIPULATED DAMAGES.

1. A religious association, assuming the name of the "Separatist Society of Zoar," being unincorporated, cannot hold property in the name thus assumed. Nor can the directors and their successors in office, appointed by the society, hold it, as the law recognizes in them no succession.

2. But the conveyance of land to an individual and his heirs, for the use of the society, constitutes him the trustee, and the members the cestui que trusts.

3. Where land has been paid for by the proceeds of the joint labor of a community, each individual, unless the contrary be made to appear, will be presumed to have an equal interest in the land.

4. Under such circumstances, the cestui que trusts may enter into a legal and binding contract among themselves, to relinquish their individual interests in the trust, for a common interest in the whole property, so long as they shall remain members of the association, relinquishing for themselves and their heirs all right beyond that limitation, to the property, and also all claim for their labor, they receiving during their membership, under the distribution of agencies appointed by themselves, provision for their support, of clothing, and in every other particular.

[See note at end of case.]

5. Such an agreement does not require the solemnities of a grant, but is a declaration of trust, which being in writing, is valid.

6. The members of the society reserve to themselves the power to alter the contract at discretion, and through its agents to sell the property, and also to admit new members on the terms of the original association; under such conditions, the contract is not void, as establishing a perpetuity. Its continuance depends on future voluntary contracts, and not on any principle in the original instrument.

[See note at end of case.]

7. A court of equity may not decree a forfeiture. It will relieve against a penalty, but not against stipulated damages.

8. Nor will a court of chancery give relief against a bona fide contract of a party, entered into for a valuable consideration.

[This was a bill in equity by John G. Goesele and others, heirs of Johannes Goesele, against Joseph M. Bimeler and others, for a partition of certain lands claimed by

---

1 [Reported by Hon. John McLean, Circuit Justice.]

2 [Affirmed in 14 How. (55 U. S.) 589.]

plaintiffs as the individual property of Johannes Goesele.]

Gholson & Quin, for complainants.
T. Ewing and H. Stanbery, for defendants.

OPINION OF THE COURT. The complainants in this case, claim to be tenants in common in a large property in Zoar, purchased by a religious society called "Separatists," of which their ancestor was a member. From the facts stated in the pleading and evidence, it appears that in 1807 the society having suffered much persecution at Ball, in the kingdom of Wirtemburg, Germany, emigrated to the United States. They arrived at Philadelphia, in a destitute condition, where pecuniary aid was afforded them by the friend Quakers of London and Philadelphia. Whilst there, the society purchased five thousand five hundred acres of land from one Godfrey Hager, on credit, situated in Ohio, to which the charity received enabled them to go, and on which they settled, calling the place Zoar. The purchase was made by Bimeler, one of the defendants, who took the title in his own name, holding the land as he has uniformly declared, in trust for the society.

At this time the association seems not to have contemplated a community of property. The land was paid for by the proceeds of the united labor of the society.

On the 15th of April, 1819, the society entered into articles of association, prefaced by the following preamble: "The undersigned, members of the society of Separatists of Zoar, have, from a true Christian love towards God and their fellow-men, found themselves convinced and induced to unite themselves according to the Christian Apostolic sense, under the following rules through a communion of property; and they do hereby determine and declare that from the day of this date, the following rules shall be valid and in effect:"

1. "Each and every member does hereby renounce all and every right of ownership, of their present and future movable and immovable property; and leave the same to the disposition of the directors of the society elected by themselves."

2. "The society elects out of its own members, their directors and managers, who shall conduct the general business transactions, and exercise the general duties of the society. They therefore take possession of all the active and passive property of all the members, whose duty it shall be at the same time to provide for them; and said directors are further bound to give an account to the society of all their business transactions."

The other articles relate to the duties of the members of the society, the adjustment of difficulties which may arise among them, and an agreement that backsliding members cannot, either for property brought in, nor for their labor in the society, demand any compensation or restitution, except under the order of a majority of the society.

These articles were subscribed by the members of the society generally, and among them is found the name of John Goesele, senior, the ancestor of the complainants. Under this association, the society prospered, made extensive improvements, paid for its lands first purchased, bought other tracts and paid for them, and secured in a high degree the comforts of life. No change was made in the above articles until the 18th of March, 1824. Under the most solemn appeal to the Trinity the society then declares:

"We, the undersigned, inhabitants of Zoar and its vicinity, etc., being fully persuaded and intending to give more full satisfaction to our consciences, in the fulfillment of the duties of Christianity, and to plant, establish, and confirm the spirit of love as the bond of peace and union for ourselves and posterity forever, as a safe foundation of social order, do seek and desire, out of pure Christian love and persuasion, to unite our several personal interests, into one common interest, and, if possible, to avoid and prevent law suits and contentions, or otherwise to settle and arbitrate them under the following rules, in order to avoid the disagreeable and costly course of the law, as much as possible. Therefore, we unite and bind ourselves by and through the common and social contract under the name and title of 'The Separatist Society of Zoar,' and we agree and bind ourselves, and promise each to the other and all together, that we will strictly hold to, observe, and support all the following rules and regulations. New articles, amendments, or alterations, in favor of the above expressed intentions, to be made with the consent of the members.

Article I.

"We, the undersigned, members of the second class of the society of Separatists, declare, through this first article, the entire renunciation and resignation of all our property of all and every dimension, form, and shape, present, and future, movable and immovable or both, for ourselves and our posterity, with all and every right of ownership, titles, claims, and privileges, to the aforesaid society of Separatists, with the express condition, that, from the date of the subscription of each member, such property shall be forever, and consequently also after the death of such member or members, remain the property of the said Separatist society."

Directors were to be elected by the society, who were authorized to take all the property of the individual members and of the society into their disposition, and to hold and manage the same expressly for the general benefit of the society, according to the prescriptions of the articles. They shall have power to trade, to purchase, and to sell, to conclude contracts and dissolve them again, to give orders if all of them agree, with the consent of the cashier, who was to be elected by the society. They were "to appoint agents and

to conduct the entire provision of all and every member in boarding, clothing, and other necessaries of life, in such proportion as the situation, time, and circumstances may require." And the members bound themselves to obey the orders and regulations of the directors and their agents. The children of the members during their minority, were to be subject to the control of the directors, but without the votes of a majority of the society, they cannot bind apprentices out of the association.

The directors are required to take charge of inheritances of deceased members as universal heirs, in the name of the society; to investigate and settle disputes among the members, an appeal being allowed to a board of arbitrators, which was to be elected and to consist of from one to three persons. The arbitrators were bound to observe the economy of the society, and give orders and instructions, to investigate accounts and plans which may have been made by the directors and their agents. All transactions, exceeding in amount fifty dollars, to be valid, required the sanction of the board of arbitration. This board had also the power to excommunicate arbitrary and refractory members, and to deprive them of all future enjoyments of the society.

New members were to be admitted, being of full age, having been approved of by the directors and board of arbitration, by a vote of two-thirds of the society; and on condition that they should resign all their property to the society, as had been done by the original members. Directors and arbitrators were to be elected as often as shall be deemed necessary by the society. "The highest power shall be and remain forever in the hands and disposition of the society, who reserves the right at pleasure to remove and to establish officers, or to place others in their stead; in short, to make any alteration which may be deemed best." "The cashier was bound to keep all the funds of the association, and to apply all moneys which may come to his hands, by the orders of the directors and arbitrators to the benefit of the society—to pay its debts and to liquidate its general wants."

And it is agreed that individual demands by backsliding members, or such as have been excommunicated, whether such demands may be for goods, or other effects, or for services rendered to the society, are abolished and abrogated by the members for themselves and their posterity. These articles are declared to be confirmatory of those of 1819, and extending to a more detailed explanation. The name of Goesele, the complainants' ancestor, was also subscribed to the above articles, with the other members, generally, of the society.

On the 6th of February, 1832, an act of the legislature of Ohio was passed, incorporating Joseph M. Bimeler and others, by the name of "The Society of Separatists of Zoar," with perpetual succession, with power to hold property, purchase and sell, pass by-laws, etc. And afterwards, on the 21st of February, 1846, an amendatory act was passed, modifying a restriction on the income of the society from one to ten thousand dollars. In pursuance of the power given, a constitution was adopted by the society, and other acts conformably to the law were done under it.

There is satisfactory proof that the complainants are the heirs at law of John Goesele, as represented in their bill, who came to this country as a member of the Separatist society, and who continued a member until his death in 1827. It also is shown that the lands purchased were paid for with the proceeds of the labor of the society; consequently, all who contributed, by their labor, to these payments, have an interest in the lands, unless such interest has been relinquished or abandoned. If such right remain and descended to the complainants, the court would presume that the individual claims of the members were equal, unless the contrary were clearly shown.

There was some evidence that Goesele, in Germany, was considered a man of wealth; and that his real estate was worth a large sum. Some of the witnesses state that his property was sold, and from which an inference is drawn that Bimeler received the money. But no facts are proved which authorize this conclusion. On the contrary, it appears that the only money paid for the lands shortly after their arrival at Zoar, was a pittance which some of them had saved of the eighteen dollars which they had each received, as a charity, in Philadelphia.

The legal questions in this case principally arise out of the articles of 1819 and of 1824. The latter articles include, substantially, those of the former, with some additional provisions and a more detailed regulation, in regard to the general government of the society. The right set up in the defense must rest on those articles, as the act of incorporation was not passed until several years after the death of Goesele.

Against the validity of the defense, two grounds are assumed by the complainants' counsel. First, it is objected that there is no grantee; and, secondly, that if there were a grantee, the grant would be void as a perpetuity.

That the lands were purchased by Bimeler for the society, were paid for by it, and are now held in trust by him, is not controverted. The fee is in him, and the members of the society are the cestui que trusts.

It must be admitted that an unincorporated community cannot, in its aggregate capacity, take lands in grant; nor can its directors and their successors in office take them, as the law, under such circumstances, recognizes no succession. A valid grant to such a community, can only be made to the individuals composing it, or to an individual and his heirs, in trust for its use.

The articles of association constitute a dec-

laration of trust, which Bimeler. the trustee, recognizes as binding upon him, though he did not sign either of the articles. This declaration did not require the formalities of a grant; it was in writing, and the application of the trust being distinctly stated, it was not affected by the statute of frauds and perjuries. The members of the society agree with each other that their property of every description should be held and used as a common fund for their general benefit, and they appointed certain agents to manage their concerns and provide for their support. It is true, they relinquished to the society their entire property, but this was done, that, as a community, they might enjoy the benefits of the whole. The agencies which they established relieved the members generally from personal care, but the sum of their enjoyment was not lessened.

The want of capacity in the society, as such, to take by grant, does not invalidate this procedure. The agreement was that the equitable individual right to the trust should be relinquished for a common right with the other members to the entire property. In effect, it was constituting a universal partnership, known to the common law, and which is not in violation of any of its principles. The members of the society, in their own language, "unite and bind themselves by and through this common and social contract, under the name and title of the 'Separatist Society of Zoar,' and they agree and bind themselves, and promise, each to the other, and all together, that they will strictly hold to, observe, and support all the following rules and regulations," etc. The name of the society was used as a designation of the whole body, the same as the assumed name of a firm to designate its partners. Individuality of ownership of the property then possessed by the members of the association was abolished, and also future acquisitions, for the common right of an interest in the whole. This common right was limited to the members of the association; consequently those who left it, or were expelled, forfeited such right. This was a condition voluntarily adopted in the articles of association, and there is no evidence showing unfairness, deception, or fraud in the agreement. And the members emphatically declare, that "the officers shall be elected and established by a majority of the votes; consequently, the highest power shall be and remain forever in the hands and disposition of the society, who does hereby reserve the right, at pleasure, to remove and to establish officers, or to place others in their stead; in short, to make any alteration which may be deemed best."

It would be a novel condition in a grant, that the grantor should exercise a discretionary power over the thing granted. and enjoy all the benefits resulting from it. But, it would not be more novel, than that one or more individuals should make a grant to themselves. And if this be a grant, what other character can be given to it? The relinquishment of individual right, present and future, was to the society—in other words, to themselves—a giving up and surrendering an individual interest in a part of the property, for a common interest in the whole of it. By this arrangement, the members of the association were placed on an equality, as to their interests in the property, and their enjoyment of it. Their minutest wants were alike provided for, through the agencies established; and this was the consideration on which the contract was founded. That, in the absence of all fraud and unfairness, this was a bona fide and legal contract, cannot be doubted. An important part of this contract was, that the property thus surrendered should belong only to the members of the association; consequently the heirs of the members could not claim an interest in the property as heirs, but only as members. Against such a disposition of property, I know of no principle of law or morals. Any individual has the power to divest himself of his property, real and personal, for a valuable consideration.

But it is said if the articles be considered a contract, a court of chancery would not decree a specific execution of it. And reference is made to the personal services to be rendered by the members, and the guardianship of their children in a state of minority. And it is also contended that a court of chancery will never decree a forfeiture.

The form in which the question is put is no test of the principle. Admit that a contract for personal services will not be specifically decreed, as there is an adequate remedy at law; yet it does not follow that an individual who has performed labor, under a bona fide contract for a fixed compensation, may invoke the aid of a court of chancery to pay him again for the same services. And this, too, without any allegation or proof of fraud in the contract. Chancery may not technically decree a forfeiture, but no court of chancery will give relief to an individual, against his own contract, entered into in good faith, without mistake, and for a valuable consideration. It will give relief against a mere penalty, but not against a sum named as stipulated damages. Goesele and the other members, when they relinquished their individual property for a common interest in the whole, and appointed agents to manage the concern, expressly agreed to receive as a consideration for their property and labor, a support for themselves and their families, including clothing and every other provision necessary for their comfort. The acquisitions would necessarily increase their comforts, by enlarging their means of subsistence; but the property was only to be enjoyed while they continued members. This was the substance of the contract, fairly entered into and ratified under the most solemn sanctions, after five

years' experience. There was no grantor or assignee, and none was necessary. It was a partnership agreement among themselves, and was binding upon each individual who entered into it.

If there be no principle of law opposed to such a community of property, it must be held valid, on the rules which apply to partnerships. There are no moral considerations opposed to it. In adopting it, the Separatist society followed the example found in the early history of the Apostles, and which received an awful sanction of heaven.

But it is said, that this association contemplates an enjoyment of the property in perpetuity, that those who shall become members of it, through all time, shall enjoy it, and that this the law will not permit.

The common law is said to abhor perpetuities. The strong national feeling in England against the entailment of estates, as being inconsistent with the free enjoyment of property, influenced the courts to establish the rule that no conveyance should be valid, by executory devise or otherwise, which did not vest in twenty-one years after the termination of lives then in being. And this is an established principle of the common law, modified so as to extend to the fraction of a year beyond twenty-one, to embrace the case of a posthumous child.

The title is vested in Bimeler and his heirs without limitation upon its face; but the use is in the members of the society, present and future, so long as they shall remain members; with power in the directors generally, to sell or purchase property, for the use of the society; and this regulation, if not changed, may be perpetual. The persons through all time, who shall become members of the society, are to participate in the trust, and this is supposed to violate the above rule of law against perpetuities.

It must be observed that the title vested in the trustee from the date of the deed; and the common use, in the society, as fully when the articles were agreed to, as was contemplated at any future period. It is true, that the association could only be perpetuated by the admission of new members. But such admission is not obligatory on the society. An applicant to become a member must first apply to the directors, who bring his case before the board of arbitration, and if he pass their examination, he can only be admitted by a vote of two-thirds of the society. If admitted, it must be on the condition that he shall relinquish his individual property to the members of the association, and with them enjoy a common benefit in the whole. This is matter of contract at the time, as it was at the formation of the society. The perpetuity then, is not created by the first contract, but depends upon subsequent contracts, which may or may not be entered into. No right is derived or can be claimed under the articles of association, until the individual shall have complied with the conditions of his admission. He then becomes a partner in the association, and is subjected to the original articles, not from any intrinsic force in them, but because he has adopted them by contract. Here is the origin of his right, and of his obligation, and the question may well be asked, Is this a perpetuity? If it be a perpetuity, it is a perpetuity that can extend beyond lives in being, only by voluntary contracts. And where are the fetters of such a perpetuity?

But the most decisive objection against this assumed perpetuity is, that the cestui que trusts, in agreeing that their interests in the entire property should be common, reserved to themselves the right "to make any alteration" in the articles of association, "which may be deemed best." Can a perpetuity be subject to the exercise of such a power? A perpetuity must appear upon the face of a grant or will. It may depend upon a contingency, as the birth of a child, after the limitation allowed; but there can be no uncertainty, as to the event on which the right is to attach. And this is made certain by the instrument which creates the estate.

This association, in principle, does not differ from any other partnership, where the members create the capital, by giving up their property to the concern, living upon their profits, applying their surplus to an increase of capital, and receiving new members on the terms of the original association. This, if carried out, may endure for many generations, but it is not a perpetuity, which the law prohibits. The enjoyment of the right, on condition of continued membership, has no necessary connection with a perpetuity. If the condition be broken by a member, it depends upon the individuals and the society whether he shall be restored or not.

There is no line of succession marked out by this association, no postponement beyond the time limited by law, when the right shall vest, no family aggrandizement contemplated, no fetters imposed upon the enjoyment of the common property, except the consent of the society, and that the applicant shall come in on equal terms with other members.

The society is peculiar in its organization. Its members seem to have been influenced by a high sense of religious duty—and they evince a determination to reach "a better inheritance."

The attempt made to impeach the character of Bimeler, by taking the title to the real estate in his own name, and in the management of the general concerns of the society, is not, in my judgment, sustained by the evidence; much less is the imputation against him of immoral conduct sustained. No one acquainted with the imperfections of our nature could expect, from an association like that of Zoar, for any great length of time, an entirely harmonious action. Dissatisfactions under such a system will more or less arise from the contributions of labor re-

quired, or the distribution of the fruits of such labor. The jealousy of the human heart often finds sources of discontent in the ordinary intercourse of life. Words are misconstrued, a look or an act is misunderstood, and many other things are considered as evidence of neglect or intentional offense, when the person charged is entirely innocent of the motive attributed to him. And not unfrequently are such sentiments cherished by persons who are influenced by the base or unworthy motives which they attribute to others. This is generally the conduct of narrow minds, and it may sometimes be found in persons of more enlarged capacity. There is nothing in the evidence, conducing to impeach the conduct of Bimeler, that may not be accounted for on the above principles.

Upon a deliberate consideration of this case, I am brought to the conclusion, that the complainants are not entitled to relief against the contract of their ancestor, entered into bona fide and for a valuable consideration. For the reasons stated, I think the agreement entered into by the members, giving up their individual interest in the property for a common interest in the whole of it, so long as they shall remain members, is not void in law; and consequently the bill of the complainants must be dismissed.

[NOTE. On appeal to the supreme court the judgment was affirmed in an opinion by Mr. Justice McLean who said that the ancestor of these heirs renounced all right of individual property when he signed the articles and did so upon the consideration that the society would support him in sickness and in health which was deemed by him an adequate compensation. Under these articles no right of property descended to his heirs. The articles do not constitute a perpetuity because the society only exists at the will of its members, a majority of whom may dissolve it at any time. 14 How. (55 U. S.) 589.]