[No. 2212]

SU LEE AND CHARLEY BI YEN, SUING FOR THEM-SELVES AND OTHERS AS MEMBERS AND ON BEHALF OF THE LIN HING GUNGSHA, OR JOSS HOUSE SOCIETY, OF RENO, NEVADA, APPELLANTS, *v.* F. J. PECK, JOHN QUINN, JAMES MAY, A. H. MANNING, C. H. MARTIN, AND IDA ROBBINS, RESPONDENTS.

[160 Pac. 18]

1. GIFTS—LAND—SUFFICIENCY OF EVIDENCE.
     Evidence in a suit to quiet title to land occupied by a joss house *held* to show a gift of such land to a joss house society.

2. TRIAL—QUESTION OF FACT—NONSUIT.
     On a motion for a nonsuit, the evidence should be construed in favor of the plaintiff.

3. RELIGIOUS SOCIETIES—PROPERTY—CAPACITY TO TAKE GIFT.
     An unincorporated joss house society can take title to real estate in this state under the common-law rule that land may be given to pious uses before there is a grantee competent to take, and that, in the meantime, the fee lies in abeyance and vests when the grantee exists.

4. RELIGIOUS SOCIETIES—GIFT—CAPACITY TO TAKE—ESTOPPEL.
     Where a lot was given to a joss house society in consideration that the Chinese inhabitants would locate in the vicinity of the lot, and of the society's improvements on the lot, the donor and his grantee are estopped from asserting the society's incapacity to take title to the lot.

APPEAL from Second Judicial District Court, Washoe County; *R. C. Stoddard,* Judge.

Suit by Su Lee and Charley Bi Yen, suing for them-selves and others as members and on behalf of the Lin Hing Gungsha, or Joss House Society of Reno, Nevada,

against F. J. Peck and others. From a judgment of nonsuit and from an order denying a motion for a new trial, plaintiffs appeal. **Reversed,** and cause remanded for new trial, NORCROSS, C. J., dissenting.

*Cole L. Harwood,* for Appellants:

The court erred in entering the judgment of nonsuit. and refusing to grant a new trial, because the testimony showed a gift to the plaintiffs for a public charitable use. Under the facts in the case, the doctrine of charitable uses is clearly applicable. (Storey's Equity, 13th ed., vol. 2, p. 503, 513, 514; 6 Cyc. 903.) It has been decided in many cases that the doctrine rests purely upon grounds of public policy and well-known principles of equity. (*Ould* v. *Washington Hospital,* 95 U. S. 303; *Russell* v. *Allen,* 107 U. S. 163.) It is even held that where the gift is to a person incapable of taking, the grantor himself holds in trust. (*Werlein* v. *Kurtz,* 2 Peters U. S. 566; *Reformed Church* v. *Schoolcraft,* 65 N. Y. 134.)

There can be no dispute upon the legal proposition that a gift of real estate may be made which is valid in law, provided possession is delivered and followed by valuable improvements made in good faith, and that the possession is held for the statutory period.

*M. B. Moore* and *Hoyt, Gibbons & French,* for Respondents:

The motion for nonsuit was properly granted, an unincorporated religious society being incapable of acquiring title to real estate; and, further, the plaintiffs had not shown a gift of the premises in question, but had shown only a license to occupy the premises, without the payment of rent, at the will of the real owners, and such license could not ripen into title. (*McDonald* v. *Fox,* 20 Nev. 368; *Lathrop* v. *Levarn,* 74 Atl. 331; Standard Cyc. of Proc. vol. 1, p. 618.)

The house erected on the premises was not dedicated solely to religious worship, and the celebrations held therein did not amount to religious worship, such as is

contemplated or recognized in any civilized country. (*People* v. *Ruggles*, 5 Am. Dec. 335.)

Respondents disclaimed any personal interest in the premises, and having failed to prove the existence of any so-called joss house society, the alleged organization cannot itself maintain the action. (*Mexican Mill* v. *Yellow Jacket Co.*, 4 Nev. 40, 97 Am. Dec. 510.) "Mere voluntary religious associations are incapable of taking or holding real property in their society name." This rule is well-established and settled in numerous jurisdictions. (*Stewart* v. *White*, 55 L. R. A. 211; *Hardesty's Succession*, 22 La. Ann. 332; *In re New South Meeting House*, 13 Allen, 497; *Betts* v. *Betts*, 4 Abb. En. Cas. 317; *Liggett* v. *Ladd*, 21 Pac. 133; *Goesele* v. *Bimeler*, 10 Fed. Cas. No. 5503, 5 McLean, 223; *Gallupville Reformed Church* v. *Schoolcraft*, 65 N. Y. 134.)

Failure to pay taxes on real estate for a period of five years will defeat title by adverse possession. (*Reno Brewing Co.* v. *Packard*, 103 Pac. 415, 104 Pac. 801.) Even though the law provides that the property of a church is exempt from taxation, the church or religious society, in order to acquire title to property by adverse possession, must comply with the statute regarding the payment of taxes. (*Wisner* v. *Chamberlain*, 7 N. E. 68; *Streeter Co.* v. *Frederickson*, 91 N. W. 692; *Timmons* v. *Kidwell*, 27 N. E. 756.)

By the Court, Coleman, J.:

This is an appeal from a judgment of nonsuit and from an order denying a motion for a new trial.

1. Su Lee and Charley Bi Yen, suing for themselves and others as members of and on behalf of the Lin Hing Gungsha, or Joss House Society of Reno, Nevada, an unincorporated society, brought suit against the defendants to quiet title to certain real estate. The pleadings are in the usual form. At the conclusion of the evidence offered on the part of the plaintiffs, a motion for a nonsuit was interposed. The court sustained the motion, upon the ground that an unincorporated society cannot take title

to real estate in Nevada. In denying the motion for a new trial the court adhered to its original view, and also held that plaintiffs had failed to prove a gift of the property in question to the society, but that the evidence showed only a license to occupy the premises in question without rent, and that possession under such conditions was not such an adverse possession in the society as could ripen into title.

We will consider the last proposition first.

Ong Chee, a witness in behalf of plaintiffs, testified:

"Q. Well, did you have anything to do with the location of that joss house over there? A. Yes; that time when I was put up money, me help to build that building. * * *

"Q. Well, now, state what you had to do, if anything, with the location of the joss house in Chinatown? A. * * * Well, when—first after the fire burn up the town and Mr. Manning asked these Chinamen to move down that place, first place Chinamen think that place is too low; didn't want to move down in the first place. After that they come talk to me and try to get these Chinamen to move down there and he willing to give them a place, a lot of land to build a church, joss house, and then I told him I will move up to Carson—I ain't got anything to do with this town—and you better go down there and talk to Su Lee and Quong Ah Moon, that is the store name, man's name keeps the store here.

"Q. Well, did you have a further talk with Mr. Manning and Mr. Haskell about it? A. Then I take Mr. Manning—you see, that time Chinatown burn, and that fellow Quong Ah Moon and Su Lee had a laundry house on this side of the depot, and I take him up there and show him the place where Su Lee is and Quong Ah Moon is, and he have a talk with them. So I didn't talk to him afterwards. * * *

"Q. State exactly, as near as you can remember, what either Mr. Manning or Mr. Haskell said about giving this land, if anything? A. Well, he says he give—he willing to give that piece of land to build joss house, a lot of land.

"Q. Who did he say that to? A. He say that to me first place. And then I tell him I move my store up to Carson City, and I ain't got nothing to do with it, and then I take them up to talk to Su Lee and Quong Ah Moon.

"Q. Did you have—did you hear what they said to him? A. Yes; I hear him. I haven't time to wait for them, and after that they stay there and talk a long while, I suppose; I didn't wait for them. I tell him to go up there and explain it to Su Lee and Quong Ah Moon.

"Q. When was this? What year was this conversation that you refer to? A. That was on the '78.

"Q. About '78? A. In 1878.

"Q. Do you know how soon after that the joss house was built that you describe, the two-story building, the first one? A. That joss house built in '79. I suppose on about between April and May, I think.

"Q. In '79? A. In '79 I think; about in the summer time.

"Q. Were you ever in that building after it was built? A. Oh, yes. I was here when he build him; they had lots of fun there, lots of people from Winnemucca and Truckee and all those places come here.

"Q. Had a kind of ceremony? A. Yes; had some kind of ceremony.

"Q. And were you ever in— That building you have said was burned. Were you ever in the building that is there now? A. Oh, yes.

"Q. When did you move to San Francisco? When did you leave Nevada? A. I leave Nevada about 26 years ago.

"Q. About 26 years ago? A. Yes.

"Q. And how many times were you in that building; say that is there now? A. Well, the time that he build it I think many times; many times when he build it before I went to San Francisco, and then when I come back from San Francisco mostly 2 or 3 years time I come up here and sometimes drop in. Many times I been in there.

"Q. And do you know what the building that was put on there first, the two-story building, what it was used for? A. Joss house.

"Q. Well, what do you mean by that? What is a joss house used for? A. Joss house, you know, what the Chinese please God, see.

"Q. Use like a church? A. Just the same like a church, yes.

"Q. Well, just describe how it was used? A. Well, joss house the same as people—you people please the same, all the same people same as church, all the same; nearly the same.

"Q. Well, what do the Chinamen do that go there? A. Well, sometimes Chinamen go there, you know, please God, some Chinamen, you know always please God. Anything he want to do anything he go ask God. And then any Chinaman sometimes have a dispute from the other, then all go there and try to have compromise make out, make him come and man decide the business there sometime. Any of the Chinamen or one of them have a dispute one to the other, you know, and they try to make compromise, settle it, anything of that kind, business men all go there to meet him, get him settle it, you know. Any poor man dead, anything of that kind, always that society they help him out. Anybody got no money to bury it, anything of that kind, they pay out money to bury them. Any sick man, anything of that kind, they try to help him.

"Q. Well, do they take sick men there sometimes? A. Yes; sick man in behind little place hospital before; right behind joss house.

"Q. Right behind the joss house? A. Yes.

"Q. Are you acquainted with the customs of Chinese people? A. This Chinatown here?

"Q. Do you know the customs and manners of Chinese people? A. China people here in town?

"Q. Yes. A. Oh, yes.

"Q. And are you acquainted with the customs of Chinese people in San Francisco and in China? A. Yes.

"Q. Then I will ask you whether this building called the joss house here was used as a joss house according to the customs of Chinese people? A. Yes."

Su Lee, one of the plaintiffs, testified in part as follows:

"Q. Ask him if he knew a man named Manning and a man named Haskell. A. Yes, sir.

"Q. Ask him if he ever had any conversation with Mr. Manning or Mr. Haskell about the joss house and Chinatown. A. Yes, sir.

"Q. Let him state what they said to him. A. He says since the Chinatown burn people in Reno went—the Chinese move out and find a new location, and some fellow, white fellow, ask the Chinese want to move another way, so the Chinese don't like it. So Mr. Manning said, 'Why don't you move down here?' The same now as the Chinatown here.

"Q. All right. Go ahead. A. Then Mr. Manning and Haskell call all the Chinamen and interview the new Chinatown, view the place, and all Chinese like that place, so Mr. Manning build two houses, one or two wooden buildings, to rent to all Chinese. And now one brick building, as some now occupy, and he contract with Mr. Manning to build that store.

"Q. All right. Go ahead. A. Since Mr. Manning build that two house, and some Chinamen they went to build some more cabin on the Chinatown by themselves, by Chinamen, and a year later the Chinese want to build a church, the so-called joss house. And he is with Mr. Manning to build that joss house.

"Q. Well, ask him if Mr. Manning said anything, or Mr. Haskell, about giving him or the China boys a lot for a joss house. A. Yes, sir.

"Q. What did they say? A. So he asked Mr. Manning, Mr. Haskell, if he could give the lot to the Chinamen to build a joss house. Then Mr. Manning take him down to Chinatown; told him he could have the lot. He give the lot to him, and say he could build joss house any size he want, and he charge no rent and pay no tax, and give

it to him to protect all Chinese sick people; was forever Chinese.

"Q. Ask him if Mr. Manning or Mr. Haskell went with him and he marked out the lot, put stakes down, or anything like that. A. Mr. Manning take him down and measure and show him the lot, stuck up square all of the corner and show him that is the place going to build for joss house. That is what Mr. Manning said.

"Q. And ask him if they set up stakes, stick stakes, on the corners. A. Yes, sir.

"Q. Ask him if that was the same place they build the joss house. A. Same place. * * *"

"Q. Ask him if Mr. Manning or Mr. Haskell, or any other person, ever said they owned the property, or said anything about the property, about the title to the property after that time. A. He said he asked Mr. Manning. Manning said give to him; this belong to the joss house property."

Charley Bi Yen, a witness called in behalf of plaintiff, seemed to have given a portion of his testimony direct and some through an interpreter. In answering directly, when asked what was said by Mr. Manning, the witness replied:

"Yes, I give China boy for the joss house. I tell him Mr. Peck no use lawsuit, row. No use row about that. I tell him Mr. Peck * * * Manning tell him Mr. Peck, he say."

The following seems to have been the testimony which the witness gave through an interpreter:

"Mr. Manning did tell Mr. Peck I give that joss house to the Chinamen. Don't bother with it. Leave it alone."

The testimony upon which it is claimed that a license was granted to use the lot in question for a joss house is that of the witness John Fraser, wherein he testified relative to a conversation with Mr. Manning, and said:

"And we got to talking about old times in Reno, and this China question was brought up, and I says, 'There ain't much left down in Chinatown now except the joss

house on the south side.' And he says, 'No.' He says he guessed they will keep that as long as they don't have to pay anything on the rent of the ground. He didn't tell me that he gave them the ground or anything of that kind. But he said they had never paid any rent on it."

2. We cannot see that there is anything in the testimony of the witness Fraser which is in conflict with the evidence of the other witnesses. He simply related that Manning had said that the society did not have to pay rent; but Manning did not say he had or had not given the ground to the society. If he had given the ground to the society "forever," as testified by Su Lee, they certainly would not have to pay rent. The language used by Manning was in no way contradictory of the testimony given by the witnesses who appeared in behalf of the plaintiffs. It is an elementary rule that on a motion for a nonsuit the evidence should be construed strongly in favor of the plaintiff. (*McCafferty* v. *Flinn*, 32 Nev. 269, 107 Pac. 225.)

3. This brings us to a consideration of the question whether an unincorporated religious society can take title to real estate in Nevada. We think it can. Counsel for respondents, in support of their contention, rely upon the following language from 34 Cyc. p. 1149, to sustain their position:

"Mere voluntary religious associations are incapable of taking or holding real property in their society name."

Some of the cases cited in support of the text rely upon *Trustees of Baptist Association* v. *Hart*, 4 Wheat. 1, 4 L. Ed. 499, to sustain the position taken, while the case of *Goesele* v. *Bimeler*, Fed. Cas. No. 5503, 5 McLean, 223, affirmed, Id., in 14 How. 589, 14 L. Ed. 554, was not a case of a gift for charitable uses. Some of the other cases cited do not give the question the consideration which it merits. The case which most strongly sustains the position of respondents is that of *Baptist Association* v. *Hart*, *supra*, but that case was overruled by a unanimous court in *Vidal* v. *Girard's Executors*, 2 How. 127, 11 L. Ed. 205, the opinion having been written by Story, J., who was a

member of the court when *Baptist Association* v. *Hart* was decided. After some consideration of the common law and the statute of 43 Elizabeth, known as the "Statute of Charitable Uses," the opinion proceeds:

"There are, however, dicta of eminent judges (some of which were commented upon in the case of 4 Wheat. 1, 4 L. Ed. 499) which do certainly support the doctrine that charitable uses might be enforced in chancery upon the general jurisdiction of the court, independently of the statute of 43 Elizabeth, and that the jurisdiction had been acted upon, not only subsequent, but antecedent, to that statute. Such was the opinion of Sir Joseph Jekyll in *Eyre* v. *Countess of Shaftsbury*, 2 P. Will. 103, 2 Equity Abridg. 710, pl. 2, and that of Lord Northington in *Attorney-General* v. *Tancred*, 1 Eden, 10 (S. C. Ambler, 351, 1 Wm. Black. 90), and that of Lord Chief Justice Wilmot, in his elaborate judgment in *Attorney-General* v. *Lady Downing*, Wilmot's Notes, p. 1, 26, given after an examination of all the leading authorities. Lord Eldon, in the *Attorney-General* v. *Skinner's Company*, 2 Russ. 407, intimates in clear terms his doubts whether the jurisdiction of chancery over charities arose solely under the statute of Elizabeth, suggesting that the statute has perhaps been construed with reference to a supposed antecedent jurisdiction of the court, by which void devises to charitable purposes were sustained. Sir John Leach, in the case of a charitable use before the statute of Elizabeth (*Attorney-General* v. *Master of Brentwood School*, 1 Mylne and Keen, 376) said: 'Although at his time no legal devise could be made to a corporation for a charitable use, yet lands so devised were in equity bound by a trust for the charity, which a court of equity would then execute.' In point of fact the charity was so decreed in that very case, in the twelfth year of Elizabeth. But what is still more important is the declaration of Lord Redesdale, a great judge in equity, in *Attorney-General* v. *Mayor of Dublin*, 1 Bligh New R. 312, 347 (1827), where he says: 'We are referred to the statute of Elizabeth, with respect to charitable uses, as creating a

new law upon the subject of charitable uses. That statute only created a new jurisdiction; it created no new law. It created a new and ancillary jurisdiction, a jurisdiction created by commission, etc.; but the proceedings of that commission were made subject to appeal to the lord chancellor, and he might reverse or affirm what they had done, or make such order as he might think fit for reserving the controlling jurisdiction of the court of chancery as it existed before the passing of that statute; and there can be no doubt that by information by the attorney-general the same thing might be done.' He then adds: 'The right which the attorney-general has to file an information is a right of prerogative. The king, as *parens patriæ*, has a right, by his proper officer, to call upon the several courts of justice, according to the nature of their several jurisdictions, to see that right is done to his subjects who are incompetent to act for themselves, as in the case of charities and other cases.' So that Lord Redesdale maintains the jurisdiction in the broadest terms, as founded in the inherent jurisdiction of chancery independently of the statute of 43 Elizabeth. In addition to these dicta and doctrines, there is the very recent case of the *Incorporated Society* v. *Richards*, 1 Drudy and Warren, 258, where Lord Chancellor Sugden, in a very masterly judgment, upon a full survey of all the authorities, and where the point was directly before him, held the same doctrine as Lord Redesdale, and expressly decided that there is an inherent jurisdiction in equity in cases of charity, and that charity is one of those objects for which a court of equity has at all times interfered to make good that which at law was an illegal or informal gift; and that cases of charity in courts of equity in England were valid independently of and previous to the statute of Elizabeth.

"Mr. Justice Baldwin, in the case of the will of Sarah Zane, which was cited at the bar and pronounced at April term of the circuit court in 1833 (see Brightly's N. P. Repts. Magill & Brown, 346, note), after very extensive and learned researches into the ancient English

authorities and statutes, arrived at the same conclusion in which the district judge, the late lamented Judge Hopkinson, concurred; and that opinion has a more pointed bearing upon the present case, since it included a full review of the Pennsylvania laws and doctrines on the subject of charities.

"But very strong additional light has been thrown upon this subject by the recent publications of the commissioners on the public records in England, which contain a very curious and interesting collection of the chancery records in the reign of Queen Elizabeth, and in the earlier reigns. Among these are found many cases in which the court of chancery entertained jurisdiction over charities long before the statute of 43 Elizabeth; and some fifty of these cases, extracted from the printed calendars, have been laid before us. They establish, in the most satisfactory and conclusive manner, that cases of charities where there were trustees appointed for general and indefinite charities, as well as for specific charities, were familiarly known to, and acted upon, and enforced in, the court of chancery. In some of these cases the charities were not only of an uncertain and indefinite nature, but, as far as we can gather from the imperfect statement in the printed records, they were also cases where there were either no trustees appointed, or the trustees were not competent to take. These records, therefore, do, in a remarkable manner, confirm the opinions of Sir Joseph Jekyll, Lord Northington, Lord Chief Justice Wilmot, Lord Redesdale, and Lord Chancellor Sugden. Whatever doubts, therefore, might properly be entertained upon the subject when the case of the *Trustees of the Philadelphia Baptist Association* v. *Hart's Executors*, 4 Wheat. 1, 4 L. Ed. 499, was before this court (1819), those doubts are entirely removed by the late and more satisfactory sources of information to which we have alluded."

From the quotation it will be seen that the case of *Baptist Association* v. *Hart* is completely overthrown, and the rule that a gift to an unincorporated religious society of property to be dedicated to pious uses was held

to be good at common law. We know of no decision wherein the opinion in *Vidal* v. *Girard* has been criticized. In *Ould* v. *Washington Hospital*, 95 U. S. (5 Otto) on page 313, 24 L. Ed. 450, it is said:

"At common law, lands may be granted to pious uses before there is a grantee competent to take. In the meantime, the fee will lie in abeyance. It will vest when the grantee exists. (*Town of Pawlet* v. *Clark*, 9 Cranch, 292, 3 L. Ed. 735.) See, also, *Beatty* v. *Kurtz*, 2 Pet. 566, 7 L. Ed. 521, and *Vincennes University* v. *Indiana*, 14 How. 268, 14 L. Ed. 416."

See, also, *Russell* v. *Allen*, 107 U. S. 163–167, 2 Sup. Ct. 327, 27 L. Ed. 397; *Werlein* v. *New Orleans*, 177 U. S. 390, 20 Sup. Ct. 682, 44 L. Ed. 817; *McCord* v. *Ochiltree*, 8 Blackf. (Ind.)15; *St. Peter's Church* v. *Brown*, 21 R. I. 367, 43 Atl. 642; *Lewis Estate*, 1 Pa. Dist. Ct. R. 423; *Preachers' Aid Soc.* v. *Rich*, 45 Me. 552; *Washburn* v. *Sewall*, 9 Metc. (Mass.) 280; *Swazey* v. *Am. Bib. Soc.*, 57 Me. 523; *Trenton Soc.* v. *Howell*, 63 Atl. (N. J.) 1110; *Miller* v. *Chittenden*, 4 Iowa, 252; *Hornbeck* v. *Am. Bible Soc.*, 2 Sandf. Ch. 133; *Paschal* v. *Acklin*, 27 Tex. 173; *Pennoyer* v. *Wadhams*, 20 Or. 274, 25 Pac. 720, 11 L. R. A. 210.

In *Schmidt et al.* v. *Hess et al.*, 60 Mo. at page 595, the rule is laid down as follows:

"No doubt is entertained that the gift under consideration is a charity, and falls within the meaning of the rules of chancery. (2 Sto. Eq. Jur. sec. 1164, and cases cited.) And, although in consequence of the nonincorporation of the church for whose benefit the grant was made, there was no one *in esse*, at the time of making the donation, capable of being the recipient of the trust, yet, the use being a charitable one, a court of equity, having ascertained the intent of the grantor, will not allow the grant on that account to fail, but will see to its effectuation. (2 Sto. Eq. Jur. secs. 1165, 1166, and cases cited; *Potter* v. *Chapin*, 6 Paige N. Y. 639, and cases cited; *St. Louis County Court* v. *Griswold*, 58 Mo. 175.)"

In considering the question involved here, it is said in 6 Cyc. 903:

"They are construed as valid· when possible, and are often upheld where private trusts would fail.  A gift in trust for a charity not existing at the date of the gift and the beginning. of whose existence is uncertain, or which is to take effect upon a contingency that probably will not happen within a life or lives in being and twenty-one years afterwards, is valid if there is no gift of the property meanwhile to or for the benefit of any private person.   In consequence of such favor, gifts of this character are sustained, though vaguely expressed, and when a gift is clearly for a charitable use, the trustees named therein take the legal estate in fee, though the deed does not in terms run to their heirs and assigns; and though the instrument of gift makes no provision for the conveyance to trustees, the donated property becomes immediately charged with the trust in the hands of either the executors or heirs.   Equity will not permit these trusts to fail because its particular purposes are uncertain, or for want of a trustee, though no existing donee is named, from which it results at common law that though the gift to a charitable use is to a voluntary association or an unincorporated society which is uncertain, indefinite, and fluctuating in its membership, the court will nevertheless, under the common-law rule, at least uphold it and appoint a trustee to take and administer the fund according to the terms of the grant."

The most recent decision sustaining our position is that of *In re Upham's Estate,* 127 Cal. 90, 59 Pac. 315, from which we quote:

"It is contended, however, that the trust is void because the parties named as trustees are incapable of taking the property.   The trustees of the orphans' home, it is true, do not constitute a corporation.   It was organized under the auspices of the Grand Lodge of the Independent Order of Good Templars of the State of California, which is a corporation, and it is under the management and control of a continuous board of trustees, consisting of eight persons, one-half of whom are selected every two years by the order.   These trustees seem to be appropriate

persons to take charge of this charitable fund, and manage it for the purposes of the trust; but, even if it should be held that in a strict legal sense they are not capable of taking, yet the charity would not fail for that reason. A court will not allow a charitable trust to fail for want of a legal trustee. Of course, in this country courts of equity will not go so far in executing indefinite charities as the courts of equity went in England under the statute of 43 Elizabeth, for there, if it could be discovered from a deed or will that anything in the nature of a charity was intended, however vague or indefinite, the chancellor would devote it to some sort of a charity. But in this country courts have been extremely liberal in construing charities, and under principles analogous to the doctrine of cy-pres have enforced trusts far more indefinite and inexact than the one here involved."

4. We are of the opinion that not only is the contention of appellants sustained by the great weight of authority but by sound reason as well, and, in view of the fact that the lot was given to the society in consideration of the locating in the vicinity of the lot in question of the Chinese inhabitants of Reno, and of the making of the improvements which were made by the society upon the lot, that equity and good conscience should for all time close the mouth of Manning and his grantees to assert the incapacity of the society to take title to the property in question.

It is ordered that the judgment be reversed, and that the case be remanded for a new trial.

McCarran, J.: I concur.

Norcross, C. J.: I dissent.